UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

YELLOWFIN YACHTS, INC.,

      Plaintiff,

v.                                                          CASE NO. 8:15-cv-990-T-23TGW

BARKER BOATWORKS, LLC, et al.,

      Defendants.

_____/

## **ORDER**

Not anchored by a non-competition or a non-solicitation contract, former

Yellowfin Yachts executive Kevin Barker left Yellowfin and founded a competitor,

Barker Boatworks.  With the aid of nautical architect Michael Peters, Barker

designed a twenty-six-foot, center-console bay boat with a "sweeping" or "s" sheer

line.  Typically co-extensive with a boat's rubrail, the sheer line describes the

intersection of the hull and the deck of a boat.  (Appendix 1, which shows common

sheer lines)  According to Yellowfin Yachts owner Wylie Nagler, the "sweeping"

sheer line distinguishes a Yellowfin from other boats, and a Barker's overall

appearance (or "trade dress") is so similar to a Yellowfin's that a buyer in the market

for a $125,000 center-console likely will confuse the two.

In addition to alleging that Barker infringed Yellowfin's trade dress, Yellowfin

sues (Doc. 26) Kevin Barker and Barker Boatworks for false designation of origin,

common law trade-dress infringement, common law unfair competition,

misappropriation of a trade secret, and civil conspiracy.  The defendants move

(Doc. 86) for summary judgment.

## BACKGROUND

In 1998 Wylie Nagler founded Yellowfin Yachts.  Nagler's first model, a

thirty-one-foot center-console, borrowed design elements from Conch, another boat

manufacturer.  (Nagler Depo. at 24–25)  Nagler used a Conch as a "buck,"

template, for the Yellowfin and modified the Conch's design.  (Nagler Depo. at 25)

Nagler introduced more models, including smaller, center-console bay boats.

Nagler and Kevin Barker met around 2003 when Barker bought a

thirty-six-foot Yellowfin.  (Nagler Depo. at 38)  Around 2005, Barker and Nagler

began discussing Barker's buying an ownership interest in Yellowfin and, while the

ownership discussions continued, Nagler hired Barker as a salesman.  (Barker Depo.

at 15–17)  Prepared to sell Barker an ownership stake in Yellowfin, Nagler drafted a

"shareholder agreement."  (Composite Exhibit 4)  Because Nagler's draft contract

included a non-competition clause and a non-solicitation clause, Barker demurred.

(Nagler Depo. at 69)  Despite Barker's refusal to agree to a non-competition or a

non-solicitation clause, Nagler permitted Barker to work at Yellowfin (by that time,

Barker managed Yellowfin's inshore division), and Nagler never insisted that Barker

sign a non-competition or non-solicitation contract.  (Nagler Depo. at 69–70)

In May 2014 Barker resigned from Yellowfin.  (Barker Depo. at 26–31)  On May 22, 2014 — Barker's last day at the Yellowfin office — Barker downloaded several hundred files from Yellowfin's main server.  (Barker Depo. at 115)  Barker states that the files contained information about his sales and that Barker wanted to preserve the information in case Nagler disputed the commission owed to Barker.[1] (Barker Depo. at 115–16)  Barker denies using the downloaded files to solicit customers but admits that he contacted several Yellowfin customers and suppliers using contact information stored on his personal phone.  (Barker Depo. at 133)

In July 2014 Barker founded Barker Boatworks and hired nautical architect Michael Peters to design Barker's first model.  (Barker Depo. at 26–31)  Peters's notes from the first meeting describe Barker's vision — a twenty-six-foot bay boat with a 300- or 350-horsepower engine and a draft between fourteen and seventeen inches. (MPYD 239)  Also, Peters's notes state that Yellowfin "looks to[o] much offshore (too much flare)."  The phrase "bay boat look" appears beneath the Yellowfin reference, and Barker argues that the phrase evinces an intent to design a boat that looks different from a Yellowfin.  After a months-long exchange, Barker and Peters finalized the boat's design.

Yellowfin alleges that Barker copied Yellowfin's "sweeping" sheer line.  The "swept," "sweeping," or "s" sheer line appears on most bay boats, although several other sheer lines appear in the market.  (Appendix 1, which shows common sheer

---

[1] Although an executive employee, Barker's pay was partly commission-based; Barker received a fixed amount for each Yellowfin he sold.

lines)  According to Yellowfin, a Barker and a Yellowfin look so similar that a potential buyer likely will confuse the two.

## DISCUSSION

The Lanham Act protects trade dress, which is a product's overall appearance. *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983).  Not a substitute for a patent or copyright, trade dress prevents a junior manufacturer from free-riding on a senior manufacturer's goodwill by selling a product confusingly similar in appearance to the senior product.  *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 354–55 (5th Cir. 2002) (Jones, J.).  To prevail on the trade-dress claim, Yellowfin must articulate a distinctive feature the purpose of which is primarily aesthetic.  Also, Yellowfin must prove that the feature identifies a boat as a Yellowfin (that is, the feature must have acquired a "secondary meaning") and must prove that a potential buyer likely will confuse a Barker for a Yellowfin.  *AmBrit v. Kraft, Inc.*, 812 F.2d 1531, 1536 (11th Cir. 1986) (stating the elements of a trade-dress claim).

### 1. Yellowfin's failure to describe the sheer line sinks the trade-dress claim.

A plaintiff must describe with words the distinctive feature of trade dress, and a plaintiff who seeks protection for a line of products "faces the particularly difficult challenge of showing that the appearance of its several products is sufficiently distinct and unique to merit protection as a recognizable trade dress."  *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2d Cir. 1997) (Oakes, J.).  A plaintiff's

inability to identify and describe a distinctive, aesthetic feature exposes a trade-dress claim too vague to succeed. *Landscape Forms*, 113 F.3d 373 at 380–81.

To describe the allegedly infringed sheer line, Yellowfin includes in the complaint nine pictures that show Yellowfin boats of different length. But a finder of fact cannot "be expected to distill from a set of images those elements that are common to a line of products." *Mike Vaughn Custom Sports, Inc. v. Piku*, 15 F.Supp.3d 735, 747 (E.D. Mich. 2014) (Lawson, J.) (dismissing an action where the complaint described the trade dress with a series of images rather than with words) (quoting *Nat'l Lighting Co., Inc. v. Bridge Metal Indus., LLC,* 601 F.Supp.2d 556, 562–63 (S.D.N.Y. 2009) (Buchwald, J.) (same)).

The record includes no words that describe the allegedly infringed sheer line. Asked how to measure Yellowfin's sheer line, Nagler declines to identify the inflection point, the height, the slope, or any distinctive property of the sheer line.[2] Rather, Nagler states that, "[i]f you box" and superimpose the Yellowfin and Barker sheer lines, "they line up with each other." (Nagler Depo. at 37) An interrogatory asks Yellowfin to "[d]escribe in detail Yellowfin's alleged protectable trade dress infringed by Defendants . . ." (Exhibit K to Barker's motion for summary judgment)

---

[2] Although Nagler never compares the sheer line properties for each boat, William Ganner does: "The sheer line on the Yellowfin has a lot shallower rise to it as it goes forward and a much sharper drop at the bow. The Barker — and I can actually tell you this because I measured one the other day — the curvature on the Yellowfin . . . is only about three-quarters of an inch, whereas on the Barker it is an inch and a half." (Ganner Depo. at 21)

Again, Yellowfin's answer shows nine pictures of Yellowfin boats.  (Exhibit K)

Also, the answer states:

> The sheer line is the sweeping, curved shape formed by the upper edge
> of the side of the hull from the bow to the stern.  Yellowfin's unique
> sheer line, in the context of the overall hull shape, comprises
> Yellowfin's trade dress rights in its boat line.

(Exhibit K)  Throughout the twenty-two months from the complaint to the present,

Yellowfin repeats the phrase "unique sheer line" without explaining the unique

feature of the sheer line.  (E.g., Doc. 111-1 at 3, at which Nagler states that

"Yellowfin is claiming that its swept sheer line or S-shaped sheer line is unique to

Yellowfin.  There are others that may have a swept sheer line, but none . . . have a

swept sheer line or S-shaped sheer line that look[s] like Yellowfin's sheer line.").

Yellowfin seeks to enjoin Barker from infringing Yellowfin's trade dress.  But,

if Yellowfin's founder cannot describe with words the infringed feature, neither can

an injunction.  Because Yellowfin fails to describe the allegedly distinctive and

infringed sheer line, the trade-dress claim cannot succeed.  *See Shevy Custom Wigs, Inc.*

*v. Aggie Wigs*, 2006 WL 3335008 at *5 (E.D.N.Y. Nov. 17, 2006) (Gleeson, J.)

(dismissing a trade-dress claim because the plaintiff failed to explain "not just *which*

features are distinctive, but also *how* they are distinctive") (italics original).

**2. The sheer line is functional.**

A feature is functional if the feature is "essential to the use or purpose of the

[product] or if [the feature] affects the cost or quality" of the product.  *Inwood Labs.,*

*Inc., v. Ives Labs, Inc.*, 456 U.S. 844, 850 n.10 (1982).  According to Nagler, a low

sheer permits an angler to "boat" (or bring aboard) fish more easily.  (Nagler Depo. at 157)  The easy boating of fish is undoubtedly advantageous to a fishing boat.  A high sheer at the bow prevents water from pouring into the boat in a high sea. (Nagler Depo. at 189, agreeing that Yellowfin's choice of sheer depends on the "use of the boat" and noting that a flats boat need not feature a high bow and sweeping sheer line because "flat skiffs don't go out in very rough water very often") Necessary to connect a low stern with a high bow, an ascending sheer line is functional.  The conflicting but conclusory statement in Nagler's affidavit (Doc. 111-1 at 3, stating that a sheer line is non-functional) fails to show a genuine dispute of material fact.  *Van T. Junkins and Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656 (11th Cir. 1984) (affirming summary judgment for a defendant, despite the plaintiff's submission of an affidavit that purportedly showed a factual dispute, because the plaintiff's deposition testimony contradicted the plaintiff's claim).

Also, a feature is functional if the "exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 165 (1995).  Boat manufacturers must choose among a handful of sheer lines (Appendix 1), and the market prefers a sweeping sheer line.  (Mielke Report at 8–11)  Designer Dan Mielke explains that "the vast majority of bay boats incorporate a very similar 'S' sheer line."[3]  (Mielke Report

---

[3] Yellowfin moves (Doc. 146) to exclude Mielke's expert opinion on functionality because Mielke purportedly "overgeneraliz[ed]" Yellowfin's claim by assuming that Yellowfin "claims trade dress in all 'S' . . . sheer lines." As Section 1 explains, Yellowfin's failure to articulate the "unique"

(continued...)

at 13)  Because Yellowfin's exclusive use of the sweeping sheer line significantly

disadvantages a competitor by preventing the competitor's satisfying a market

preference, the sweeping sheer line is functional.

Attempting to distinguish the typical sheers from Yellowfin's purportedly

"unique" sheer, Yellowfin argues that Barker could have chosen among an "infinite

number of [sheer lines]."  (Doc. 111 at 8)  In *TrafFix Devices, Inc. v. Mktg. Displays,*

*Inc.*, 532 U.S. 23 (2001), which forecloses Yellowfin's argument, Marketing Displays

copied TrafFix's "dual-spring design," and the lower court observed that Marketing

Displays easily could have chosen a design similar but not identical to TrafFix's

design.  *Mktg. Displays, Inc.*,  *v. TrafFix Devices, Inc.*, 200 F.3d 929, 940 (6th Cir. 1999)

(Boggs, J.).  Reversing the lower court's decision, the Supreme Court explains that a

competitor lawfully may copy a functional feature not protected by a patent.  *TrafFix*,

532 U.S. at 29–34 (stating that "copying is not always discouraged or disfavored by

the laws which preserve our competitive economy") (citing *Bonito Boats, Inc. v.*

*Thunder Craft Boats, Inc.*, 489 U.S. 141, 160 (1989)).  Because a sheer line that sweeps

from the high bow to the low stern is functional and because Yellowfin lacks a patent

for the "sweeping" sheer line, Barker lawfully may use the "sweeping" sheer line.

---

[3] (...continued)
feature of the sheer line prevents the granular analysis of Yellowfin's trade-dress claim. The motion
warrants denial.

**3. No reasonable jury could conclude that a potential buyer likely will confuse a Barker for a Yellowfin.**

Even if Yellowfin describes the sheer line and shows evidence that the sheer line is aesthetic, Yellowfin fails to proffer evidence permitting a reasonable jury to conclude that a potential buyer likely will mistake a Barker for a Yellowfin. The likelihood of confusion depends on (1) the strength of Yellowfin's trade dress, (2) the similarity of Barker's and Yellowfin's designs, (3) the similarity of retail outlets, (4) the similarity of buyers in the pertinent market, (5) the similarity of competing advertisements, (6) the defendant's intent to confuse buyers about a product's manufacturer, and (7) the extent of actual buyer confusion, if any. *AmBrit*, 812 F.2d at 1538 (stating the factors relevant to the likelihood of confusion).

First, Nagler admits that several other boats have a "sweeping" sheer line. (E.g., Nagler Depo. at 193 (Cobia), at 203 (HydraSports), at 208 (Sailfish), at 210 (Conch), at 212 (Cape Horn)). Ubiquitous in the center-console market, Yellowfin's purportedly "distinctive" feature deserves little protection. *See Sun Banks of Florida, Inc. v. Sun Fed. Sav. and Loan Ass'n*, 651 F.2d 311, 315–16 (5th Cir. 1980) (explaining that extensive third-party use of a mark counsels against likely confusion).

Second, both Barker and Yellowfin sell a product generally similar in appearance — a twenty-five-foot, center-console bay boat. But several prominent differences permit a potential buyer to distinguish a Barker from a Yellowfin. Every Yellowfin displays the "Yellowfin" logo, and Nagler states that "[e]veryone knows [a boat is] a Yellowfin" partly because of the distinctive and conspicuous Yellowfin

logo.  (Nagler Depo. at 157, 236)  Barker prominently displays the Barker logo on

every boat, and Nagler admits that Yellowfin's and Barker's logos look nothing alike.

(Nagler Depo. at 158)  As *Versa Prod. Co, Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 203

(3d Cir. 1995) (Becker, J.), explains:

> [E]xcept where consumers ordinarily exercise virtually no care in
> selecting a particular type of product as may be the case with
> inexpensive disposable or consumable products, clarity of labeling in
> packaging and advertising will suffice to preclude almost all possibility
> of consumer confusion.

50 F.3d at 203 (internal citation omitted); *accord AmBrit, Inc.*, 812 F.2d at 1540

(explaining that "the presence of dissimilar word[-]marks lessens the possibility of a

finding of similarity of design").  Also, Barker's hull — which includes a different

flare and two "tunnels" visible when the boat is on land or planing — differs from

Yellowfin's hull.  Additionally, Barker omits the rolled transom typical of most

Yellowfin models.  (*See* Doc. 26 at 3–5, in which six of the nine models pictured

include a rolled transom)  Finally, the layout of each boat is different.  (Nagler Depo.

at 109–110)  The design differences likely will preclude a potential buyer's mistaking

a Barker for a Yellowfin.

Third, neither party sells a boat through a retail outlet.  In a successful

trade-dress action, both parties typically sell a product in the same store, and the

defendant's product often sits in the same retail display as the plaintiff's product.

*E.g.*, *Isaly Co. v. Kraft, Inc.*, 619 F.Supp. 983, 993 (M.D. Fla. 1985) ("The competing

products are often displayed side by side in the store."), *rev'd in part on other grounds*,

812 F.2d 1531 (11th Cir. 1986).  The proximity of the products might conduce to

- 10 -

confusion, especially if the products cost little money (which tends to reduce consumer scrutiny).  In contrast, a customer approaches Yellowfin or Barker and custom-orders a $125,000 boat.  That each party sells a boat directly to a consumer militates mightily against a potential buyer's mistakenly ordering a Barker instead of a Yellowfin.

Fourth, each party competes for a customer who wants to purchase a center-console bay boat about twenty-five feet in length.  This factor indifferently favors Yellowfin.

Fifth, Barker and Yellowfin concededly advertise in several of the same forums, including the magazines *SaltWater Sportsman* and *Sport Fishing*.  (Doc. 86 at 19)  Also, both companies attend the same boat shows, for example, Miami, Palm Beach, and Fort Lauderdale.  (Doc. 86 at 19)  The similarity of advertising forums might contribute to confusion, although the absence from the record of Barker advertisements prevents comparing the parties' advertisements.  *See AmBrit*, 812 F.2d at 1542 (explaining that the "similarity of advertising" evaluates whether the parties advertise in similar forums and whether the advertisements appear similar).

Sixth, the record contains no evidence that Barker copied Yellowfin's design in an attempt to confuse a potential buyer.  *See AmBrit*, 812 F.2d at 1542–43 (noting that "intent" means the defendant's intent to confuse a potential buyer about the identity of a product's manufacturer).  When Kevin Barker first met with Peters, the nautical architect, Barker told Peters to "look at" a twenty-one-foot Conch, a twenty-four-foot

Yellowfin, and a Shaeffer center-console.  But Peters's notes reveal that Kevin

Barker, who sought a "bay boat look," wanted Peters to distinguish Barker's design

from Yellowfin's, which to Kevin Barker looked "to[o] much [like an] offshore"

center-console.  (Peters's notes, MPYD 239)  Peters states that he and boat

manufacturers "are always trying to drive away from the other guy's boat [design];

not drive towards it."  (Peters Depo. at 43)  Peters's notes and testimony suggest no

intent by Barker to free-ride on Yellowfin's goodwill.

Yellowfin cites the testimony of William Ganner, who assisted with the Barker

design, to show Barker's intent to confuse a potential buyer.  (Doc. 111 at 4 ("The

notes taken by Mr. Ganner also show that Mr. Barker desired that the boat's sheer

line appear similar to the Yellowfin.") (citing Ganner Depo. at 20))  But in the

excerpt cited by Yellowfin, Ganner never mentions Barker's purported intent to copy

Yellowfin's design.  On the contrary, Ganner states that the curves of Barker's and

Yellowfin's sheer lines "are completely different and do not match each other at all."

(Ganner Depo. at 20)  Ganner's testimony counsels against a finding of likely

confusion, and Yellowfin fails to identify other evidence suggesting that Barker set a

course to confuse a potential buyer.

Seventh, evidence of actual confusion is the most persuasive evidence of likely

confusion.  *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 45–46 (5th Cir. 1975).  Yellowfin

admits an inability to identify a customer who mistakenly bought a Barker instead of

- 12 -

a Yellowfin.[4]  (Doc. 86-3 at 4)  In the circumstance, Yellowfin's inability is unsurprising.

Also, more than a dozen manufacturers sell a center-console about twenty-six feet in length.  (Exhibits A, K)  Aware of the array of options, a potential buyer often test-rides several boats, visits a manufacturer's facility, and solicits the opinion of other boat owners.  (Nagler Depo. at 84–85, explaining that customers typically "[go] out and look[] at other boats" and agreeing that most Yellowfin customers conduct "due diligence" before buying a boat)  Likely to encourage a "high degree of care," the $125,000 price motivates the typical buyer to research carefully the center-console market, which research significantly reduces the likelihood of confusion.  *Groeneveld Trans. Efficiency, Inc., v. Lubecore Intern., Inc.*, 730 F.3d 494, 510 (6th Cir. 2013) (Gilman, J.) (observing that the potential purchaser of an expensive product likely will exercise a "high degree of care" in researching competing products); *see also Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961) (Friendly, J.) (explaining that the likelihood of confusion depends partly on the "sophistication of the buyers").

In sum, the evidence shows that Yellowfin and Barker compete in the center-console market and that the companies advertise in the same forums.  But

---

[4] Nagler states that Yellowfin lost several sales to Barker because of the similarity of the design. (Nagler Depo. at 111) Asked which factors affect the purchasing decision, Nagler states that there are "two [reasons] . . . [t]he personal relationship that [a customer] had with Kevin and the style of the boat." But Nagler offers no explanation why he attributes all of the lost sales to design rather than to customer service (or to other factors, such as options, lead time, or price).

prominent design differences permit a potential buyer to distinguish easily between a

Barker and a Yellowfin.  Also, the typical potential buyer conducts "due diligence"

before spending $125,000 on a new boat, and Yellowfin admits an inability to

identify a customer who mistakenly bought a Barker instead of a Yellowfin.  Even

viewing the record favorably to Yellowfin, no reasonable jury could conclude that a

potential buyer likely will confuse a Barker for a Yellowfin.

**4. The Harper study fails to show a factual dispute about likely confusion.**

To establish the likelihood of confusion, Yellowfin proffers a survey by

Rhonda Harper.  A purported advertising expert, Harper rented a booth at the Palm

Beach Boat Show to conduct a "maritime industry survey."  To entice boat show

attendees to take the survey, Harper offered a $10 Starbucks gift card.  "Rowdy" and

drinking alcohol, most attendees declined to participate, and at least thirty

respondents quit partway through the survey.  (Harper Depo. at 224–26)  Harper

eventually collected 265 responses and concluded that the Barker design "pose[s] a

clear likelihood of confusion among the relevant universe."  (Harper Report at 3)  Of

the 181 people who answered the question about the "YELLOW FIN stimulus,"

eighty-eight (48.6%) identified the "stimulus" as a Yellowfin, sixteen (8.8%)

identified the stimulus as a Barker, and seventy-seven (42.5%) either chose another

boat or could not identify the stimulus. Of the 149 people who answered the question

about the "BARKER" stimulus, eighty-one (54.4%) identified the stimulus as a

Yellowfin, eleven (7.4%) identified the stimulus as a Barker, and fifty-seven (38.2%) either chose another boat or could not identify the stimulus.

**A. *Daubert* requires the exclusion of the Harper survey.**

Barker moves (Doc. 120) to exclude Harper's opinion as unreliable under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). As Barker notes, several methodological flaws undermine the survey's reliability. First, the survey, which showed each respondent a series of cartoon drawings, fails to approximate a boat's trade dress in the market. Rather than compare an allegedly confusing trade dress "in a vacuum," a finder of fact must consider how the trade dress functions "in the actual marketplace." *AmBrit*, 812 F.2d at 1541. The cartoons in Harper's survey omit many of the details that appear on every Yellowfin. For example, in the dozens of Yellowfin photos in the record (E.g., Exhibit A to Barker's motion for summary judgment), every Yellowfin prominently displays the Yellowfin logo near the stern.

Second, the survey appears to suffer from a significant drop-out rate. Although Harper states that 265 people completed the survey, 181 responded to the Yellowfin stimulus and just 149 responded to the Barker stimulus. Harper identifies the survey's margin of error as five points, but Harper indicates that the two critical questions (the "stimuli" about Yellowfin and Barker) suffer from a "small sample size," which increases the margin of error.

As Yellowfin correctly notes, "shaky but admissible" evidence is ordinarily opposed through cross-examination and the presentation of contrary evidence.

*Daubert*, 509 U.S. at 595–96.  But the cartoon "stimuli," the small sample size, and the tipsy respondents fatally undermine the reliability of Harper's survey.  *Daubert* requires the exclusion of the survey, and the motion (Doc. 120) to exclude Harper's survey is **GRANTED**.

### B. Yellowfin fails to proffer evidence about Barker's quality.

Even if reliable, the Harper survey lacks probative value.  Yellowfin argues that the survey evinces "post-sale confusion" (Doc. 143 at 9–10), which results if a person sees a knock-off product and attributes the product's shoddy construction to the senior manufacturer.  *Cf. Retail Serv., Inc. v. Freebies Publ'g*, 364 F.3d 535, 538 (4th Cir. 2004) (Traxler, J.) (explaining that a trademark signifies "that all goods bearing the trademark are of an equal level of quality") (quoting 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 3.2 (4th ed. 2003)).  But post-market confusion requires a showing that the junior product is inferior in craftsmanship to the senior product.  *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 552 (6th Cir. 2005) (Moore, J.); *see also Payless Shoesource, Inc. v. Reebok Intern Ltd.*, 998 F.2d 985 (Fed. Cir. 1993) (Lourie, J.) (permitting a post-sale confusion claim because a consumer "might attribute any perceived inferior quality of Payless shoes to Reebok").

Other than Nagler's entrepreneurial but unsubstantiated boast that Yellowfin produces a product "far superior" in quality to Barker's product (Nagler Depo. at 114), the record remains silent about the relative quality of the two boats, and

Nagler's pride creates no genuine issue of material fact.  *See Walker v. Darby*, 911 F.2d 1573, 1576–77 (11th Cir. 1990) (explaining that the party who opposes summary judgment must "set forth specific facts showing that there is a genuine issue for trial. A mere 'scintilla' of evidence supporting the opposing party's position will not suffice.") (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986)).  On the other hand, several former Yellowfin customers bought a Barker.  (Nagler Depo. at 114) Knowledgeable about Yellowfin's craftsmanship and likely to investigate Barker's craftsmanship before spending $125,000, the customers' defections permit an inference that Barker's quality equals Yellowfin's.  Ultimately the absence from the record of evidence about the boats' relative quality prevents a reasonable jury's deciding that Barker produces an inferior product.

**5. The claims for false designation of origin, common law trade-dress infringement, and common law unfair competition fail.**

The failure to show evidence permitting a reasonable jury to conclude that a potential buyer likely will confuse a Barker for a Yellowfin defeats the claims for false designation of origin, common law trade-dress infringement, and common law unfair competition.  *Hyman v. Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179, 1186 & n.6 (11th Cir. 2002) (false designation of origin); *Am. Bank of Merritt Island v. First Am. Bank and Trust*, 455 So. 2d 443 (Fla. 5th DCA 1984) (Cowart, J.) (common law trade-dress infringement); *Donald Frederick Evans and Assocs., Inc. v. Cont'l Homes, Inc.*, 785 F.2d 897, 914 (11th Cir. 1986) (common law unfair competition).

- 17 -

**6. Viewing the record favorably to Yellowfin, no reasonable jury could find that Barker misappropriated a trade secret.**

Florida's Trade Secrets Act bars the misappropriation of a trade secret. Fla. Stat. §§ 688.001–009. Often unsuccessful, a trade secret claim cannot substitute for a non-competition or a non-solicitation contract. To prevail, Yellowfin must show that Barker misappropriated information that derives independent economic value from the fact that others lack, and cannot easily ascertain, the information. Also, Yellowfin must show reasonable protection of the secrecy of the information. Yellowfin alleges that Barker misappropriated two types of trade secret: supplier information and customer information. (Doc. 26 at ¶¶ 17, 21, 73–77)

Yellowfin alleges that the identity of Yellowfin's suppliers, the prices negotiated with suppliers, and the contracts that contain the supplier-pricing information constitute the secret, purloined information. (Doc. 26 at ¶ 21) But the documents (Composite Exhibit 3) submitted by Yellowfin as a representative example of the "supplier information" fail to substantiate Yellowfin's allegations. Most of the documents are option sheets, which Yellowfin presumably provides to any potential customer.[5] Yellowfin submits an AmeraTrail order form, but the identity of AmeraTrail, which labels each AmeraTrail boat trailer with a conspicuous

---

[5] Opposing summary judgment, Yellowfin argues that the allegedly misappropriated trade secrets include "drawings" as well as customer and supplier information (Doc. 111 at 16) and includes in Composite Exhibit 3 several drawings. Because a "plaintiff may not amend [its] complaint through argument in a brief opposing summary judgment," *Gilmour v. Gates, McDonald, and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004), this order declines to address Yellowfin's argument about the drawings.

AmeraTrail sticker, is not secret.  As a Yellowfin executive, Kevin Barker knew the

cost to order a boat trailer.  (Nagler Depo. at 144)  Because Yellowfin fails to proffer

evidence of the secret supplier information allegedly misappropriated by Kevin

Barker, no reasonable jury could find for Yellowfin.

Even if Yellowfin identifies secret supplier information allegedly

misappropriated, Yellowfin's claim fails because a supplier's identity is typically

well-known.  As Nagler concedes, a supplier's identity is not a trade secret.  (Nagler

Depo. at 143, stating that "the vendors, if [Barker] went out and contacted them

himself, would not be considered secret.")  Also, the photos in the record show that

many manufactures prominently brand their products (for example, Mercury

engines, Furuno electronics, Lee outriggers).

Yellowfin claims as a trade secret the prices Yellowfin negotiated with the

suppliers of material and of components, but that claim fails for two reasons.  First,

Barker produces too few boats to secure prices as favorable as Yellowfin.  (Nagler

Depo. at 143, stating that "a company like the size of Kevin's wouldn't be able to

make" the "deals that I make with my vendors")  Information about a volume

discount lacks independent economic value to a producer too small to secure the

discount.  Second, Yellowfin states that Yellowfin's "relationship with its

vendors[,] . . . cultivated over the years[,]" prompted suppliers to discount

Yellowfin's orders.  (Doc. 94 at 16)  Again, information about a supplier discount

that depends on the buyer's long-standing relation with the supplier lacks

independent economic value to an incipient and smaller manufacturer (that is, a

newcomer to the market likely could not secure the history-dependent discount).

Even if Barker could secure a discount from a supplier, Yellowfin's claim fails

because Barker learned Yellowfin's production cost in the ordinary course of working

at Yellowfin.  In fact, Nagler expected Barker — the executive in charge of

Yellowfin's bay-boat division — to know the cost of producing a boat.  (Nagler

Depo. at 144)  Practically and legally, an injunction cannot restrain Barker from

relying on knowledge that Barker accumulated in the ordinary course of business.

*See Renpak, Inc. v. Oppenheimer*, 104 So. 2d 642, 645 (Fla. 2d DCA 1958) (Kanner, J.)

(explaining that "[s]kill and knowledge are assets gained by an employee which are

transferable to his future use in business . . . [i]t is impossible to leave them behind so

long as they exist within the mind of the employee").  Even viewing the record

favorably to Yellowfin, no reasonable jury could conclude that the supplier

information is a trade secret.

Also, Yellowfin claims "customer information" as a trade secret.  Yellowfin

submits about three hundred pages of Yellowfin orders as a representative example of

the allegedly secret information.  (Composite Exhibit 2)  The first page of each order

contains a buyer's name, address, and contact information, and the remaining pages

show the options selected by each customer.  For two reasons, no reasonable jury

could conclude that the information is a trade secret.  First, a publicly-available

source permits the identification of a Yellowfin customer and the gathering of the

customer's contact information.[6]  Section 328.48(2), Florida Statutes, requires a

vessel's owner to register the vessel with the Department of Highway Safety and

Motor Vehicles, and the Public Records Act requires the department to provide

discoverable information about a registration, including the registrant's name and

address.  Fla. Stat. § 320.05 ("Electronic [vessel] registration records shall be open to

the inspection of the public.").  With a registrant's name and address, a person can

use the Internet or the White Pages to find the registrant's contact information.

Second, Yellowfin argues that the company reasonably protected the secrecy

of Yellowfin's main server.  Protected by a password, the server was accessible only

to Yellowfin executives.  (Barker Depo. at 117)  But the question is whether

Yellowfin reasonably protected the secrecy of the information on the server.

Yellowfin encouraged Barker to store customer information on a personal laptop and

phone.  (Nagler Depo. at 91 (explaining that Nagler permitted Barker to store

customer information on his phone so that Barker could provide "24/7,"

"white-glove service" to customers), and 163 ("[A]s an employee going to boat

shows, I would expect that [Barker] had customer folders on his laptop."))  After

Barker resigned from Yellowfin, Nagler never requested that Barker delete the

customer information on Barker's phone and laptop.  (Doc. 117 at 2; Doc. 94-1 at 11,

at which Nagler explains that he assumed Barker would delete the allegedly secret

---

[6] Yellowfin fails to explain why information about each boat's options — for example, the
fact that buyer ECA wanted a "recessed foot rest," "stainless flush cupholders," and "additional rod
holders" (Barker 004271) — has independent economic value.

information)  No reasonable jury could conclude that Yellowfin, which knew about and encouraged Kevin Barker's storing customer information on personal devices, reasonably protected the secrecy of the customer information.

Easily available from a public source and inadequately protected, the customer information is not a trade secret.  Because Yellowfin failed to secure a non-competition or a non-solicitation contract, Barker may solicit Yellowfin's customers.  *Thomas v. Alloy Fasteners, Inc.*, 664 So. 2d 59, 60–61 (Fla. 5th DCA 1995) (per curiam) (explaining that a company should expect competition "from former employees who are not bound by a non-compete contract").

**7. Yellowfin fails to proffer evidence of a conspiracy to misappropriate trade secrets.**

To succeed on a conspiracy claim, the plaintiff must show (1) an agreement between two or more persons (2) to commit a tort, (3) an overt act to further the agreement, and (4) consequent harm.  *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997) (Green, J.).  Yellowfin alleges that Kevin Barker and Barker Boatworks conspired to misappropriate trade secrets.  (Doc. 26 at 20–22)  Because Yellowfin fails to identify a trade secret that the defendants allegedly conspired to misappropriate, the conspiracy claim fails.  (*See* Section 6)

Also, a conspiracy requires two or more people, and a corporate agent's act is "attributed to the corporation," which precludes the formation of a conspiracy between a corporation and a corporate agent.  *McAndrew v. Lockheed Martin Corp.*,

206 F.3d 1031, 1036 (11th Cir. 2000).  The principal of Barker Boatworks, Kevin

Barker, cannot conspire with his own company.

Yellowfin argues that an exception to the "intra-corporate conspiracy bar"

applies (Doc. 111 at 21), but the applicable precedent recognizes two exceptions to

the intra-corporate conspiracy bar: a conspiracy to violate civil rights under 42 U.S.C.

§ 1985 and a RICO conspiracy under 18 U.S.C. § 1963(d).  *Dickerson v. Alachua Cty.*

*Com'n*, 200 F.3d 761 (11th Cir. 2000) (civil-rights conspiracy claim); *Kirwin v. Price*

*Comms. Corp.*, 391 F.3d 1323 (11th Cir. 2004) (RICO conspiracy claim); *accord*

Yellowfin's brief, Doc. 111 at 21 ("Courts have considered holding corporate agents

capable of conspiring in *civil rights cases* . . .") (italics added and internal quotation

omitted).  Yellowfin cites *Richard Bertram, Inc. v. Sterling Bank & Trust*, 820 So. 2d

963, 966 (Fla. 4th DCA 2002) (Warner, J.) (stating that an "exception to [the intra-

corporate conspiracy bar] is made where the agent has a personal stake in the

activities separate from the principal's interest"), but that statement originates in

*Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 71–72 (2d Cir. 1976) (Meskill, J.), an

action under Section 1985.  Because Yellowfin sues neither under Section 1985 nor

under Section 1963, the "intra-corporate conspiracy bar" shields the defendants from

liability.

## CONCLUSION

Yellowfin's trade-dress claim fails for several reasons.  First, a bay boat's high

bow prevents water from pouring into the boat in a high sea, and the low stern

permits the easy boating of fish.  Preferred by the market and necessary to connect a high bow and low stern, a sheer line that sweeps down from the bow to the stern is functional.  Second, Yellowfin targets "sophisticated" buyers, who typically compare boats for several weeks before deciding to buy.  Despite the buyers' sophistication, Yellowfin believes that a potential buyer likely will mistake a Barker for a Yellowfin. Although both parties produce a center-console bay boat about twenty-five feet in length, conspicuous design differences — the different logos, the different hulls, and the different layouts — permit a potential buyer to distinguish easily between the two boats (both of which resemble in general an array of other brands).  To a potential buyer, a Barker resembles a Yellowfin bay boat no more than an offshore Yellowfin resembles a dozen other boats, e.g., Conch, SeaVee, Jupiter, Venture, Invincible, Cape Horn, and others.  Even viewing the record favorably to Yellowfin, no reasonable jury could conclude that Barker infringed Yellowfin's trade dress.

Also, Yellowfin alleges that Kevin Barker, who downloaded several hundred files from Yellowfin's main server on his last day at Yellowfin, misappropriated secret supplier and customer information.  But a supplier's identity is well-known, and Barker Boatworks lacks the size and history to secure a discount from a  supplier. And Barker learned Yellowfin's production costs in the ordinary course of business at Yellowfin.  No reasonable jury could conclude that the supplier information is a trade secret.

The customer information fails to qualify as a trade secret for two reasons. First, an open-records request permits the identification of Yellowfin owners, and a White Pages or Internet search permits the gathering of a Yellowfin owner's contact information.  Second, Yellowfin, which encouraged Barker to store customer information on a personal laptop and phone and never requested that Barker delete the information, failed to reasonably protect the secrecy of Yellowfin's customer information.  Even viewing the record favorably to Yellowfin, no reasonable jury could conclude that the customer information is a trade secret.

Because Yellowfin fails to show evidence permitting a reasonable jury to find trade dress infringement, common law unfair competition, misappropriation of a trade secret, or civil conspiracy, the defendants' motion (Doc. 86) for summary judgment is **GRANTED**.  The clerk is directed (1) to enter judgment for Kevin Barker and Barker Boatworks and against Yellowfin Yachts, (2) to unseal the expert report of Augusto Villalon (Sealed Doc. 86-5) and designate the report Doc. 86-14, (3) to terminate any pending motion, and (4) to close the case.

ORDERED in Tampa, Florida, on February 16, 2017.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

- 25 -

# APPENDIX 1

SKETCH NO. 2

THESE ARE SOME OF THE CHOICES I CAN SELECT FROM
IN ORDER TO PROCEED TO THE NEXT STEP:

